## DECLARATION

1. I, AMY MOUSSEAU, am a Special Agent with the Defense Criminal Investigative Service (DCIS) and have been employed since December 2015. I am currently assigned to conduct investigations in the Boston Resident Agency of DCIS. Prior to joining DCIS, I was a Special Agent with the Naval Criminal Investigative Service (NCIS), from January 2003 to December 2015. Prior to that I was a uniformed police officer for the United States Capitol Police from July 2001 to January 2003. My duties include, but are not limited to, investigating violations of federal law, including the United States Code, 18 U.S.C. § 641, Theft of Public Property. I have conducted and assisted in numerous investigations involving violations of federal laws relating to, among other things, theft of government property and I am authorized to enforce federal forfeiture laws.

2. This Declaration is submitted in support of the Verified Complaint for Forfeiture *in rem* against the Real Property, a two family duplex/townhouse type dwelling located in the Federal Hill district, at 15-17 Hewitt Street in Providence, Rhode Island. This property is currently owned in the names of Matthew T. Deleo (M. DELEO) and Julie Deleo, which property is legally described and referred to in the Records of Land Evidence City of Providence, Book 10964, Page 286 as follows:

> BEGINNING AT AN IRON ROD SET IN THE WESTERLY LINE OF HEWITT STREET, 150.00' SOUTHEASTERLY FROM THE SOUTHERLY LINE OF ATWELLS AVENUE, SAID POINT BEING THE SOUTHEASTERLY CORNER OF LAND NOW OR FORMERLY OF STEVEN MERESL, SAID POINT ALSO BEING THE NORTHEASTERLY CORNER OF HEREIN DESCRIBED PARCEL. THENCE RUNNING NORTHWESTERLY BOUNDED NORTHEASTERLY BY SAID MERESL LAND A DISTANCE OF 55.00' TO SET IRON ROD;
> THENCE TURNING AN INTERIOR ANGLE OF 89°57'30" AND RUNNING SOUTHWESTERLY, BOUNDED NORTHWESTERLY IN PART BY LAND NOW OR FORMERLY OF GIOVANI & RICHARD DORAZIO, AND IN PART BY OTHER LANDS OF GIOVANI & RICHARD DORAZIO, 60.00' TO A POINT;
> THENCE TURNING AN INTERIOR ANGLE OF 90°02'30" AND RUNNING SOUTHEASTERLY, BOUNDED SOUTHWESTERLY IN PART BY LAND NOW OR FORMERLY OF JOHN M. MATTERA, IN PART BY LAND NOW OR FORMERLY OF FRANK S. MIELE, AND IN PART BY OTHER LAND OF FRANK S. MIELE, A DISTANCE OF 55.00' TO A DRILL HOLE SET IN THE EASTERLY LINE OF SAID HEWITT STREET;

THENCE TURNING AN INTERIOR ANGLE OF 89°57'30" AND RUNNING NORTHEASTERLY BOUNDED SOUTHEASTERLY BY SAID HEWITT STREET A DISTANCE OF 60.00' TO THE POINT AND PLACE OF BEGINNING, THERE FORMING AN INTERIOR ANGLE OF 90°02'30" WITH THE FIRST DESCRIBED COURSE;
SAID ABOVE DESCRIBED PARCEL CONTAINS 3,300 S.F. OF LAND.
SAID ABOVE DESCRIBED PARCEL IS SHOWN ON THAT PLAT ENTITLED: "ADMINISTRATIVE SUBDIVISION ASSESSOR'S PLAT 28, LOTS 537 & 543 PROVIDENCE, RHODE ISLAND 15-17 HEWITT STREET PREPARED FOR: PICO DEVELOPMENT PREPARED BY: HARRY A. MILLER, JR, PLS 86 STONE AVENUE, WARWICK, RI 02889 SCALE: 1" =10' SEPTEMBER, 2005 SHEET 1 OF 1 REV: 8/25/07"
BEING FORMERLY DESCRIBED AS RECORDED LOT NO. 9 (NINE) AND RECORDED LOT NO. 10 (TEN) ON THAT CERTAIN PLAT ENTITLED: "PLAT OF THE DOCTOR HEWITT LAND PROVIDENCE BY CUSHING & FARNUM 1856" WHICH PLAT IS RECORDED IN THE LAND EVIDENCE RECORDS IN THE CITY OF PROVIDENCE IN PLAT BOOK 3 AT PAGE 44 AND (COPY) ON PLAT CARD 84.

For ease of reference, I refer to the above described Real property as the "Real Property."

3.  The information set forth in this affidavit is based on my own investigation, information provided by others involved in this investigation, my training and experience, and the training and experience of others involved in this investigation. I do not set forth all information known to law enforcement about this matter, as the purpose of this affidavit is to set forth only cause sufficient to support initiation of a civil forfeiture action.

<u>Proceeds From Theft of Department of Defense Property</u>

a.  From approximately August of 2012 through October 2015, M. DELEO stole from the Department of Defense (DoD), and then sold substantial amounts of the stolen DoD property online through various means to include eBay. "eBay" is a US based multi-national corporation and e-commerce company providing consumer to consumer and business to consumer sales services via the internet. Recipients of M. DELEO's sales and shipments of stolen DoD property include, but are not limited to, Russia, The People's Republic of China (PRC), and The Republic of Korea (ROK).

b.  eBay records show that from August 2012 through October 2015, M. DELEO, utilizing eBay user name "the-kings-surplus," conducted multiple fraudulent transactions

involving stolen Department of Defense property totaling over $229,000. A Confidential Source (CS-1) reported M. DELEO's illegal activity to the Massachusetts State Police in 2014. CS-1 stated that M. DELEO's eBay user name was "the-kings-surplus." PayPal records show that M. DELEO, utilizing the eBay user name "the-kings-surplus" and the corresponding PayPal account under the email address "ebayking107@yahoo.com," sold and shipped stolen DoD property to various entities located within the United States, as well as foreign nations, including the PRC and ROK. PayPal records contain the eBay user name and the item/auction identification number from eBay, thus showing a direct link between PayPal records and eBay records. PayPal records for M. DELEO show over $641,000 in wire transfers from M. DELEO's PayPal account to M. DELEO's Bank of America (BOA) account ending in 3997. BOA records show that M. DELEO and his mother, Cynthia Deleo, jointly share the BOA account 3997.

    c.     In November 2015, a Homeland Security Investigations (HSI) Undercover Agent (UCA) purchased a United States Navy (USN) Parka, Size Large, from M. DELEO via M. DELEO's eBay account operated under the eBay user name "the-kings-surplus." From the eBay website for "the-kings-surplus," payment was remitted to M. DELEO from the UCA to the PayPal account associated with "ebayking107@yahoo.com." eBay records show that M. DELEO maintained the eBay account under his true name, cell phone number and the address of 17 Hewitt St, the address of the Real Property. HSI investigators identified a DoD tag on the Navy Parka, containing a National Stock Number (NSN) and UPC. A review of the label stitched into the parka identified it as a "Parka, Working, US Navy Type III" with a date of manufacture of "08/12" by "API, LLC" and DoD Contract W911QY-11-D-0086. The packaging slip listed "MATT DELO (sp), 15 HEWITT ST, PROVIDENCE, RI 02909" as the shipper.

d. In December 2015, investigating agents met with a second Confidential Source (CS-2) who related that M. DELEO informed CS-2 that M. DELEO was engaged in the sale of stolen DoD property. CS-2 learned of this conduct from speaking with M. DELEO, overhearing M. DELEO speak to others, and witnessing M. DELEO's conduct. CS-2 witnessed this activity while living with M. DELEO at 15 Hewitt Street, the Real Property. CS-2 related that on at least two occasions between January and June 2015, M. DELEO and other individuals traveled from the Real Property to Virginia in order to illegally obtain DoD property, including uniform items and military ballistic vests for eventual sale to various entities located within the United States and foreign nations. Upon returning to New England with the stolen DoD property, M. DELEO stored the stolen property in various locations to include M. DELEO's residence at the Real Property, and the attached garage located at the Real Property. On at least one occasion, CS-2 observed what CS-2 believed to be "military property" at M. DELEO's residence at 15-17 Hewitt St (the Real Property).

e. On December 13, 2015, while conducting surveillance NCIS agents heard sounds that were consistent with someone tampering with the fence that controlled access to Warehouse # 4 at the Naval Weapons Station (NWS) Yorktown-Cheatham Annex, in Virginia. NCIS agents and other personnel arrested four men, including M. DELEO, as the men attempted to drive off base in a rented minivan. Found on one of M. DELEO's accomplices, Stephen GRISWOLD, were two sets of keys; one set to Warehouse # 4 and the other set to Warehouse # 3. Warehouse # 4 contained approximately $71 million dollars' worth of various types of USN uniforms and gear for official use and issuance to members of the USN, including Small Arms Protective Insert - Enhanced (SAPI-E) plates, M-16 and M-4 assault rifle magazines, USN working uniforms, jackets, pants, soft body armor, Kevlar helmets, surefire flashlight red lenses and other

U.S. military type survival gear. M. DELEO was in possession of a walkie-talkie to communicate with his accomplices and a police scanner to monitor law enforcement. A white truck registered to M. DELEO with an attached trailer was parked on NWS Cheatham Annex at a cabin rented in GRISWOLD's name. Found during the crime scene searches of the minivan, truck and rented cabin were two smashed cell phones, a hand written note detailing the dimensions of boxes and how many could fit into an area (possibly the attached trailer), and a receipt from a Home Depot store located in Newport News, Virginia, dated December 12, 2015. A 13-foot aluminum ladder, two LED flashlights, garbage bags and rope were listed on the receipt. Agents discovered a 13-foot aluminum ladder next to a Warehouse that was near Warehouse #4. Interviews conducted with the three men arrested with M. DELEO revealed the ladder was used to access the roof of a nearby warehouse in order for one co-conspirator to conduct counter-surveillance.

  f.  After M. DELEO was taken into custody, Special Agents responded to the Real Property on Hewitt Street, in Providence, Rhode Island. There, agents interviewed one of the occupants of the Real Property, C. B., who stated that he rented a room from M. DELEO. C. B. provided consent to search the common areas of the residence, to include his rented bedroom, wherein items belonging to the DoD were located, to include bullet resistant vests and side panels, USN green digital camouflage jacket, military tan boots, "beyond" brand military jacket, a camouflage backpack and a dry-fit camouflage shirt. C. B. disclosed that all the listed items were "given" to him by M. DELEO. C. B. disclosed that M. DELEO resided with him at 17 Hewitt Street, (the Real Property), and maintained a bedroom next to his. C. B. also disclosed that M. DELEO solicited C.B. to rent a storage unit in C. B.'s name for use by M. DELEO. C.B. detailed where the storage unit was located. C. B. stated that he had visited the unit in the past

with M. DELEO and observed generically labeled boxes consistent with the transport and storage of stolen United States Government (USG) property. C. B. stated that M. DELEO paid for the storage unit rented in C. B.'s name. M. DELEO's credit card records confirm this.

g. Employees at the Public Storage facility were shown pictures of C. B. and M. DELEO, and immediately identified M. DELEO as the person seen frequently entering storage unit #285, and moving large brown cardboard boxes in and out of the storage unit, and in and out of a white enclosed trailer that was towed by a white truck.

h. On December 13, 2015, federal search and seizure warrants were executed at the Real Property, and at the storage unit described by C.B. The stolen DoD property recovered from both the Real Property and the storage unit included USN working uniforms, USN winter gear, USN flame retardant shirts and pants, USN soft body armor, USN goggles, USN name tags and USN Navy SEAL Trident insignia. Many of these items were wrapped in their original factory plastic and contained the same DoD Contract identifiers as the items stored in Warehouse #4 on NWS Cheatham Annex. A large nylon banner with the words "THE KING'S MILITARY SURPLUS NAVY SEAL UNIFORMS GORE-TEX Pants – Parkas & Other Items" was located in the garage at the Real Property, as well as broken-down and partially destroyed large brown cardboard boxes, clearly marked, with color black stenciling, with DoD contract numbers and displayed "PARKA NAVY WORKING UNIFORM."

i. Utilizing the Defense Logistics Agency's Federal Logistics Information System Web Search (Web FLIS) database, DCIS determined the government's cost per item for all recovered property bearing a National Stock Number (NSN). For recovered property not bearing an NSN, contact was made directly with the manufacturer of the item in order to determine the

government's cost per item. The stolen property seized pursuant to the aforementioned search warrants is valued at approximately $400,054.

j. On December 16, 2015, C. B. was again interviewed and discussed his participation in two previous thefts from NWS Cheatham Annex with M. DELEO. C. B. stated that M. DELEO was fully aware he was stealing DoD property and was knowingly selling the stolen property online. C. B. related that often times M. DELEO would brag about his activities and how much money he was making. C. B. also related that M. DELEO used money made from selling stolen DoD property online to purchase expensive items, invest and trade in the stock market, gamble at a Rhode Island casino and to use illicit narcotics.

k. On November 22, 2016, Stephen GRISWOLD pled guilty in Rhode Island District Court to a two-count indictment charging: conspiracy to commit theft of government property (Count 1) and receiving, concealing and retaining stolen United States property (Count 2) (Cr. No. 16-26). A filed plea agreement contains facts stipulated to by GRISWOLD, including that GRISWOLD traveled to NWS Cheatham Annex with co-conspirators, including M. DELEO, during October 2015, for the purpose of stealing United States Navy property. After stealing the property, it was brought to Rhode Island for storage under the control of M. DELEO. GRISWOLD traveled with M. DELEO to NWS Cheatham Annex in December 2015, for the purpose of stealing USN property.

Forensic Audit of Proceeds

l. A Federal Bureau of Investigation (FBI) Forensic Accountant conducted a forensic review of M. DELEO's identified bank, credit card, investment and online financial accounts covering the period January 2011 to December 2015. The forensic accountant determined that over the course of the aforementioned period, M. DELEO deposited and/or

transferred $1,687,321 dollars into his BOA account ending in 3997. The majority (54%) of the funds came from M. DELEO's E*TRADE and PayPal accounts in the amounts of $276,219 and $641,871, respectively. There are also significant amounts of cash deposits, $127,560, as well as international wire transfers from the PRC, totaling $212,151.

    m.    During the same time period, records show that M. DELEO transferred $488,650 in funds from his BOA account 3997 to his E*TRADE account, and that teller/ATM cash withdrawals totaled $423,146. Additionally, $94,266, was spent at Twin River Casino in Lincoln, Rhode Island and $124,821 was transferred to pay various credit cards in M. DELEO's name. A total of $203,996 in funds was transferred to other accounts held in the names of Cynthia Deleo (BOA account ending in 5574) and/or Cynthia and Julie Deleo held jointly (BOA account ending in 7473). Of that $203,996, the majority of funds were then transferred back into M. DELEO's BOA account 3997 or to his E*TRADE account.

    n.    The forensic analysis also found that the proceeds from the sale of stolen DoD property in M. DELEO's PayPal account was his main source of income from 2014 onward. No source of legitimate income, such as payroll checks or direct deposits, was found in the 2013-2015 time-period. The last payroll deposit M. DELEO received was from the Defense Financial Accounting Service (DFAS), following his discharge from the USN in January 2013.

Proceeds Used to Purchase the Real Property

    o.    The Real Property is currently titled in the names of both M. DELEO and his sister, Julie Deleo. In 2014, M. DELEO contacted the Coldwell Bankers' listing agent for the Real Property, who will be referred to as J.C. throughout this Declaration. M. DELEO told J.C. that M. DELEO was interested in purchasing property located in the Federal Hill section of Providence, Rhode Island. M. DELEO expressed his interest in purchasing the Real Property.

J.C. dealt solely with M. DELEO and did not meet Julie Deleo in person until the day of closing. J.C. showed M. DELEO the Real Property on approximately two occasions during the sales process. J.C. did not show the Real Property to Julie Deleo or Cynthia Deleo during the sales process. M. DELEO told J.C. that M. DELEO intended to live in one half of the Real Property because it was close to where he was attending night school, and that he intended to rent out the other half of the duplex Real Property to cover the mortgage.

      p.      Records show that on August 29, 2014, two cashier's checks in the amounts of $1,000 and $14,000, were issued from M. DELEO's BOA account ending in 3997. The checks were printed "Pay To The Order Of: COLDWELL BANKERS." On September 4, 2014, these two checks were returned to M. DELEO's BOA account ending in 3997, uncashed and marked "NOT USED FOR PURPOSES INTENDED." The funds were deposited back into M. DELEO's BOA account ending in 3997. On September 5, 2014, the day after the return of M. DELEO's two checks from Coldwell Bankers, M. DELEO's E*TRADE account wired $100,000 into Julie Deleo's Middlesex Savings Bank (MSB) checking account ending in 1649. Mortgage application paperwork signed by M. DELEO described the $100,000 transfer as a "gift" to Julie Deleo. On that same day, Julie Deleo provided a MSB cashier's check for $15,000 deposit in earnest money to Coldwell Bankers. The check was drawn from the same MSB account ending in 1649; the account that M. DELEO had just wired $100,000 into. When Coldwell agent J.C. was asked why Coldwell Bankers had returned M. DELEO's two checks uncashed, the day before accepting the same amount from M. DELEO's sister, J.C. stated that it had changed from M. DELEO to Julie Deleo's name on the mortgage. J.C. opined that Julie Deleo was a more suitable candidate for a mortgage because she worked as a dental hygienist earning a regular income, while M. DELEO was a "day trader," whose income was not predictable. Julie Deleo's mortgage application

revealed that prior to September 5, 2014, Julie Deleo had only $1,300 in assets and $12,404 in debt. On August 21, 2014, the balance in Julie Deleo's MSB account ending 1649, was $80.24. On October 20, 2014, after the Real Property had been purchased, the balance in Julie Deleo's MSB account ending in 1649 was just $1,171,47. The Real Property was purchased on September 26, 2014, in the name of Julie Deleo. Present at the closing, among others, were M. DELEO, Cynthia Deleo, Julie Deleo, and J.C., the Coldwell Bankers' listing agent.

q.    In 2014 Julie Deleo worked for a dental practice in Natick, Massachusetts, approximately 42 miles away from the Real Property. Prior to and during the purchase of the Real Property, Julie Deleo lived at her mother, Cynthia Deleo's, residence in Franklin, Massachusetts. Cynthia Deleo's residence is approximately 15 miles one-way to Julie Deleo's place of employment. At the time of M. DELEO's arrest in December 2015, Julie Deleo was living with a significant other in Mansfield, Massachusetts. After M. DELEO's arrest, Julie Deleo moved back in with Cynthia Deleo. At no time has Julie Deleo lived at the Real Property.

r.    Mortgage and closing documents show that the sale price for the Real Property was $320,000. As stated in paragraph p above, on September 5, 2014, Julie Deleo provided Coldwell Bankers with a cashier's check for $15,000 in deposit/earnest money. In addition to the $15,000 in deposit/earnest money previously paid, another $64,651.34 in out-of-pocket expenses was paid in Julie Deleo's name at the closing. The Real Property mortgage incurred in Julie Deleo's name was $240,000. The deposit/earnest money and money paid at the closing as shown on the HUD-1 for the purchase and sale of the Real Property, totaled $79,651.34.

s.    Julie Deleo's MSB account ending in 1649 shows that two checks were written to M. DELEO and Cynthia Deleo on September 29, 2014, three days after the closing on the Real Property. The first check, #0366, was Pay to the Order of "Cindy Deleo" for $9,690.22, with the

memo stating "Matts Balance of Gift Expenses." The second check, #0367, was Pay to the Order of "Matthew Deleo" for $10,309.78, with the memo of "Matts Balance of Gift After Cindy Pd." It is this affiant's opinion that the handwriting on both checks, as well as the signatures on the endorsement side for both Cynthia Deleo and Matthew Deleo, are similar to handwriting obtained from checks believed to be written by Cynthia Deleo from BOA accounts ending in 3997 and 5574. It is your affiant's opinion that the handwriting on these two checks does not look like handwriting believed to be written by Julie Deleo, found on other checks written from her MSB account ending in 1649.

  t. From August 21, 2014, through October 20, 2014, other than M. DELEO's $100,000 E*TRADE transfer, the total deposits into Julie Deleo's MSB account ending in 1649, were $5,893.46. These deposits consisted of five payroll deposits, and other deposits consisting of $300 and $150.73. Records for Julie Deleo's MSB Money Fund Account ending in 0702 for the same time period show the following: a balance of $790.40 on August 21, 2014, and a balance of $2,690.48, on October 20, 2014. Deposits into this account during the same time period consist of a check for $200 and a check for $2,000. None of the activity bears a relation to the Real Property.

  u. On September 12, 2014, Julie Deleo and Cynthia Deleo opened a joint Money Fund account at MSB ending in 7633, labeled "House Account" on the MSB paperwork. Documents show the account was used for the Real Property. On September 15, 2014, Cynthia Deleo's name was removed from the account. Documents seized during the search warrant executed at Cynthia Deleo's house show an email exchange between Cynthia Deleo and "M.N." at Atlantic Mortgage and Finance Corporation dated September 15, 2014. In the email, "M.N." stated,

11

> The House Account needs to be in just Julie's name – it should not be a joint account with you or Matt.

Cynthia Deleo responded on the same date,

> I have good news. The bank was able to take my name off of Julie s checking and New house account. I will get the account activity that was set up for the House account tomorrow and send it along.

In the same email chain, on September 19, 2014, Cynthia Deleo wrote the following to "M.N":

> hello Mike,
>
> On the two individual bank letters, one is Julie's personal checking account and the other is the new account she created for the "House" that is being purchased. There is a trail showing that the $85000 was transferred from her regular personal checking into the new "House" account where all monies regarding the income and expenses will go regarding the property she is purchasing.
>
> I have been to the bank four times now. It is a very simplistic money trail. $100,000 deposited to Julie s personal checking on 09/05, a certified check for $15,000 being withdrawn. $85,000 transferred out of her personal checking into a new account called "HOUSE" on 09/12.

"M.N." then responded in part,

> "Gift documentation is always tricky, this is why I have advised to keep the accounts involved with the transaction to a minimum. Adding this new account unfortunately adds onto the paperwork we need from you."

On December 3, 2014, approximately two months after the purchase of the Real Property, the MSB account 7633 was changed again to add Cynthia Deleo back on as a joint owner of the account with Julie Deleo.

    v.    A review of the MSB Money fund account ending in 7633 (the "House Account"), reveals it was opened with a deposit of $85,040, on September 12, 2014. MSB

documents show the deposit came from a transfer of $85,000 from Julie Deleo's MSB account ending in 1649. Following the purchase of the property, the account balance for Julie Deleo's MSB account ending in 7633 on September 30, 2014, was $392.01. The withdrawals from the account during the month of September 2014 include a Treasurer's Check made out to Julie Anne Deleo on September 26, 2014, for $64,651.34, the exact amount used at the closing for the Real Property, and a $20,000 transfer to Julie Deleo's MSB account ending in 1649. The $20,000 transfer to MSB account 1649 was the source of the funds for the two checks written out to Cynthia and M. DELEO as described in paragraph s.

w. A review of documents seized during search warrants executed at both the Real Property, as well as at Cynthia Deleo's residence in Franklin, Massachusetts, indicate that M. DELEO and Cynthia Deleo were solely responsible for the renovations, day to day upkeep, landlord responsibilities, and bill payments for the Real Property. During the approximately 15 months from the purchase of the Real Property until M. DELEO's arrest, M. DELEO continued to invest money in the Real Property in terms of renovations. For example, documents seized showed one typed document in which M. DELEO declared he paid $13,500 cash between October 29, 2014 and November 11, 2014, for renovations. Additionally, a copy of a residential lease agreement for the tenants living in the Real Property lists Matthew T. DELEO as the "landlord" of the Real Property.

x. A Quit Claim Deed filed in October 2015, with the City of Providence, added M. DELEO to the property as an equal owner with his sister, Julie Deleo. J.C. told investigators that following M. DELEO's arrest in December 2015, Cynthia and Julie Deleo retained J.C. as their real estate agent and attempted to sell the Real Property. J.C. went to the Real Property and noted that M. DELEO had renovated the bathroom in one unit, improved the Juliet balconies on

both units, expanded the storage space in both garages, added a large in-wall fish tank in one unit, and had started to build decks off both units. J.C. estimated the value M. DELEO put into the renovations of the Real Property at approximately $10-20,000.

y.    Also seized at Cynthia Deleo's house was a handwritten letter dated December 22, 2015. This was while M. Deleo was incarcerated at the Virginia Tidewater Regional Correctional Facility. The envelope was addressed to Cynthia Huggins (Cynthia Deleo's maiden name), and the envelope had another inmate's name on the return address. In the letter, M. DELEO stated the following in reference to the Real Property:

> "Here is what I'm worried about. 1. My family. Please don't stress. I do not want to incriminate anyone. 2. Julies house. They have 30 Days to try and cease and break you. Paper trails…That is hers, I hope that goes well." M. DELEO later references the remodeling he did to the property "Oh, and leave the fish Tank!!! Leave the bathroom and deck unfinished, I'll be home soon." In the closing paragraph of the letter, M. DELEO wrote "Again, I can't talk on the phone about this, but I really hope the cars and property are ok." Under a post-script M. DELEO wrote "ps. Tell Jess hello for me and burn this."

4.    Based on the foregoing, there is probable cause to believe or otherwise legally sufficient cause to believe that the Real Property described above was purchased with the proceeds acquired from violations of 18 U.S.C. § 641(a) (Theft of Public Property), the proceeds of violations of the Arms Export Control Act, in violation of 22 U.S.C. § 2778, and the proceeds of the War and National Defense Act, in violation of 50 U.S.C. § 1705, and therefore the Real Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

## VERIFICATION

I, AMY MOUSSEAU hereby verify and declare under penalty of perjury that I am a Special Agent with DCIS; have read the foregoing Verified Complaint for Forfeiture *in rem* and know the contents thereof; and the factual matters contained in the Verified Complaint are true to my own knowledge and belief. The sources of my knowledge and information and the grounds for my belief are set forth in my Declaration, which is attached to the Complaint. I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

*Amy Mousseau*
AMY MOUSSEAU
DCIS Special Agent

Dated: February 28, 2017